UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:15-cv-00072-MOC-DLH

| | |
|---|---|
| JESS V. CLAMPITT JR. ) | |
| RONNIE CLAMPITT ) | |
| EARLENE VON DER OSTEN ) | |
| JOHN MCGUINNESS ) | |
| ROBERT VON DER OSTEN ) | |
| DIANE ELLER ) | |
| STEPHEN ZUCKER ) | |
| NANCY MOSTELLER ) | |
| JOHN MAKAR ) | |
| AURELIA STONE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **MEMORANDUM OF DECISION** |
| ) | **AND ORDER** |
| ) | |
| UNITED STATES FOREST SERVICE, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the court after consideration of the cross-motions for summary judgment at a bench trial held on October 3, 2016. The court has considered and reviewed the plaintiffs' Motion for Summary Judgment (ECF# 14) and the defendant's Motion for Summary Judgment (ECF #18) alongside the Administrative Record.

The case concerns an administrative action that allowed the development of a recreational shooting range within a national forest in Clay County, North Carolina. Plaintiffs assert that the government defendant violated its duties under the National Environmental Policy Act ("NEPA") as well as state statutes when it issued the approval for this project. Specifically, the plaintiffs allege that the decision, the Finding of No Significant Impact ("FONSI"), and

Environmental Assessment ("EA") were made without substantial evidence and were therefore arbitrary and capricious. Pl. Resp. to Def. Motion for Summary Judgment 1-2 (ECF # 21).

While it appears that the idea of an outdoor shooting range on Forest Service property appears to have originated with a United States Forest Service (hereinafter "USFS" or "Forest Service") employee in 2002, soon thereafter members of the public reached out to the Forest Service in 2002 to express interest in an outdoor shooting range within the National Forest. The USFS sent out calls for public comment in November 2002, May 2005, October 2007, and August 2012. The USFS solicited comment through local newspapers in May 2010 and August 2012. The agency conducted multiple scientific studies regarding noise, traffic, and dust created by the potential project.

Reaction to the proposed project was extensive and mixed. The Administrative Record shows support from the County Board of Commissioners, the County Sherriff, and the Superintendent of the county's school system. A.R. 2325, 2695, 3217-18, 2997, 3075. The Administrative Record also shows a sizeable and vocal group of opponents to the planned action, including Mountain High Hikers, the Tusquittee County Association, and the Tusquittee Landing Homeowners Association. A.R. 2573-75, 2591-92, 2552, 2707. After more than a decade of review, the USFS reached a final decision and issued a FONSI and EA in November 2013. The agency action authorized the construction of several shooting lanes, adjacent parking, and a 1,300 foot gravel road to service the new shooting range; it did not, however, provide for the construction of the project as such funding would necessarily come from private interests.

I.      **Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the

question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

## II. The NEPA and the Administrative Procedures Act ("APA")

The primary issue for determination is whether the defendant's decision, FONSI, and EA can "pass the muster of the [Administrative Procedures Act's] arbitrary and capacious standard." Pl. Resp. to Def. Motion for Summary Judgment 1 (ECF #21).

The NEPA sets forth a "regulatory scheme for major federal actions that may significantly affect the natural environment." Nat'l Audubon Soc'y v. Dept. of the Navy, 422 F.3d 174, 184 (4th Cir. 2005). The NEPA requires that federal agencies take a "hard look" at the environmental impacts of proposed actions and inform themselves of environmental consequences of such actions. Id. Courts reviewing agency actions under the NEPA must "make a searching and careful inquiry into the facts and review whether the decision . . . was based on consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 185 (citations omitted).

When agency actions are challenged under the NEPA and other statutes, such as the National Forest Management Act, the court reviews the actions under § 706 of the Administrative Procedures Act ("APA"). Judicial review under the APA is "highly deferential" with a presumption that the agency action is valid. Ohio Valley Envtl. Coal. v. Aracoma Coal Co., et al., 556 F.3d 177, 192 (4th Cir. 2009). Unless an agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it must be upheld. 5 U.S.C. §706(2)(A). A federal court reviews the agency decision to determine whether it has examined the relevant data and articulated a satisfactory explanation for its action. F.C.C. v. Fox Television

Stations, Inc., 556 U.S. 502, 513 (2009). As the Fourth Circuit has found, "so long as the agency provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained." American Whitewater v. Tidwell, 770 F.3d 1108, 1115 (4th Cir. 2014) (quoting Ohio Valley Envtl. Coal.., 556 F.3d at 192). Judicial review is particularly deferential when the agency is tasked with balancing "often-competing interests" and the resolution of the dispute involves primarily issues of fact that implicate "substantial agency expertise." American Whitewater, 770 F.3d at 1115 (citing Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1182 (9th Cir. 2000)).

The project in question was highly fact-specific and involved the weighing of conflicting community interests. After review of an extensive Administrative Record and conducting multiple scientific tests, the agency made a decision based on its specific expertise. The vocal support and opposition regarding the project clearly demonstrates that the agency's decision involved the weighing of competing interests. As such, the court's review is most deferential. Ohio Valley Envtl. Coal., 556 F.3d at 192. The court has a narrow focus: did the agency give a "hard look" to the potential environmental impact of the project as to pass muster under the NEPA and APA. The court finds that it did so.

### III. Discussion

The plaintiffs' claims can be categorized into two broad categories. First, the plaintiffs' y allege that the USFS violated the NEPA for, among other things, "failing to rigorously explore and objectively evaluate the full range of reasonable alternatives," "failing to prepare an [Environmental Impact Statement]," and failing to prepare its decision and EA to conform to the NEPA. Pl. Complaint. 19, 21, & 25 (ECF #1). Second, plaintiffs allege that the defendant agency

violated state law, N.C. General Statute § 105-230, for seeking to form "a contract that was patently invalid under North Carolina state law." Pl. Complaint 19 (ECF #1). For the reasons described below, the court rejects both sets of claims.

### a. "Hard Look"

Plaintiffs allege that the defendant agency has violated the NEPA in several ways, including, *inter alia,* that it evaluated an improper range of alternatives, failed to prepare an Environmental Impact Statement, and failed to prepare a proper decision and FONSI under the NEPA. The claims are categorized and discussed in term below.

#### i. Issuing an EA Rather Than an Environmental Impact Statement

Among the plaintiffs' 19 assignments of error, they claim that the agency's choice to issue an EA rather than Environmental Impact Statement (hereinafter "EIS") was improper. Pl. Complaint 21 (ECF #1). An EA is "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [(FONSI)]." 40 C.F.R. §1508.9(a)(1) (2008)." Ohio Valley Envtl. Coal., 556 F.3d at 191. Here, the agency issued an EA and a FONSI. An Environmental Impact Statement is reserved for major federal actions that "significantly affect[] the quality of the human environment." 42 U.S.C. §4332(2)(C) (2000). Here, the agency determined that a 4-5 acre project encompassing eight shooting lanes and 10 parking spaces deep in the National Forest could not be viewed as a major federal action affecting the quality of the human environment' thus, the Forest Service determined that an EIS was not required. See Def. Motion for Summary Judgment 19 (ECF #19). As demonstrated during the hearing, the results of three sound studies revealed little impact on the nearest homes, which were some 1.5 miles away and

further protected from noise pollution by mountain ridges. Further sound studies involving a portion of a National Forest trail revealed some impact above normal conversation, however, the Forest Service determined such impact was minimal when the entirety of the public trail system was considered in Clay County.

The court finds persuasive the standard adopted elsewhere that the agency's decision to prepare an EA rather than Environmental Impact Statement is to be reviewed under the deferential "arbitrary and capricious" standard. Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 339 (6th Cir. 2006) as such administrative determination is based on agency expertise and represents an agency decision. Here, the agency determined that an Environmental Impact Statement was not warranted. Rather than issue an EIS, it issued a FONSI setting out ten specific findings that the proposed project would have no significant environmental impact. The court defers to the agency's expertise on these specific, scientific matters as the agency and not the court is better positioned to make such a determination of environmental impact.

Inasmuch as the administrative decision to issue an EA rather than an ESI was based on extensive scientific studies, the decision was not arbitrary and capricious inasmuch as the agency provided an explanation of its decision that included a rational connection between the facts found through those studies and the choice it ultimately made. American Whitewater, 770 F.3d at 1115. The court finds no merit to this assignment of error.

### ii. Alternatives & Need for the Range

Plaintiffs also contend that the premise of the project was faulty as there was no need to build the shooting range inasmuch as a private shooting range existed in an adjoining county in

the State of Georgia. Thus, plaintiffs argue that a "no-build" alternative was rejected out-of-hand by the USFS, leading to an improper range of alternatives under discussion. See Pl. Motion for Summary Judgment 20 (ECF #15). At oral arguments, plaintiffs contended that the Forest Service should have included this extant shooting range and that if it had done so, the need for a shooting range in Clay County would have been obviated.

First, the agency's need determination finds substantial support in the EA. According to the EA, the lack of a nearby shooting range led local residents to frequently use privately owned lands in Clay County for target practice or by using National Forest lands dispersed across the county. A.R. 13. The EA went on to note, "[b]ecause no area in Clay County has been specifically designed for this use, unsafe conditions may exist from dispersed shooting on the forest" and the project was meant to "address the lack of a facility that is designed to minimize the impacts of physical, biological and social resources." Id. Thus, a logical inference arises that even if a private range was available in an adjoining county, residents were not using it, opting instead to discharge firearms on private and public lands. The agency conclusion of need finds substantial support in the EA as well as common sense.

Second, the public comments provided the agency with additional evidence supporting its finding of need. Public officials opined that a dedicated shooting range would "provide a greater measure of safety for our citizens" as the number of gun purchases were increasing and citizens "need[ed] a place where they can practice shooting in a safe, maintained environment." A.R. 2934 & 3075. Members of the public noted that shooting in uncontrolled settings increased the likelihood of accidents and raised the risk to others. E.g., A.R. 2994, 3020, 3024, 3031, 3034, & 3038.

It is not the court's role to second-guess the agency's determination here. Even if the standard was less deferential to the agency's position, the need for this range was clear from the record. The plaintiffs' argument that the agency's failure to include a no-build option fails to demonstrate how the agency violated NEPA or the APA. Clearly, the presence of a shooting range in an adjacent county had, from the outset, no impact on the identified harm as residents used uncontrolled spaces in the county to practice shooting despite being able to visit the shooting range. The court concludes that there was no harm in the agency's decision not to include the Georgia range or a no-build alternative in its EA. The plaintiffs' arguments regarding the alternatives to and need for the shooting range are, therefore, denied.

### iii. Adequacy of Impact Analysis

The third line of plaintiffs' argument concerns the basis for and adequacy of the agency's review of the environmental impact of its decision. Among the areas of concern are the potential impact of the project on the area's noise level, traffic, dust, and property values.

Regarding the noise level, the USFS conducted several sound tests. Based on the results of these tests, the Forest Service came to the conclusion that the noise would have minimal if any impact on nearby residences. A.R. 76. Among hikers, the infrequent periods of heavy use could have had potentially bothersome effects. A.R. 660. Even so, the use would drop off quickly and affected only a small portion of the trail. The USFS evaluated this information and came to a conclusion based on the record before it.

The question before the court was not whether the Forest Service made the right or best decision, but whether the agency took a "hard look" at the data before it. Review of the decision clearly shows that the USFS took the required hard look. In finding that the agency took the

required hard look, the court notes well that the agency while approving the project, noted its own continuing obligation to manage and minimize the environmental concerns identified by the studies. In particular, the decision notes that it will continue to implement a "combination of operational, site, engineering, and vegetation approaches to manage noise from the facility." A.R. 3. At the hearing, the court inquired as to the potential for lead contamination in the back-stop embankment, and the defendant answered that the Forest Service's plan includes periodic sifting of the dirt to remove lead shot. It is a reasonable action from a government agency to acknowledge a potential issue, evaluate its impact, take steps to mitigate the problem, and come to the conclusion that is not a significant environmental impact.

With regard to the traffic at and near the site, the USFS performed two studies, which were summarized in the EA. A.R. 83-87. The agency's decision acknowledged these traffic studies and noted that additional traffic calming measures were planned, including speed limit signs, speed bumps, and other signage. The USFS decision found that the planned parking area would be capable of accommodating approximately ten vehicles. Such studies and discussion of the findings in the decision provide indicia that USFS decision was based on a hard look at the available traffic evidence as it clearly incorporated the evidence in its eventual decision and EA.

The USFS also analyzed the level of dust that increased traffic may stir up and cause to settle on nearby private property. The agency conducted a dust analysis using the atmospheric dispersion modeling system, the findings of which are summarized in the record. See A.R. 861-72 and 873-89. The dust analysis using this modeling system estimated current and projected human health effects from airborne road dust related to the proposed project. A.R. 89. The analysis found that the projected increased traffic caused by the shooting range would not generate enough dust to exceed levels set by the Environmental Protection Agency. A.R. 90. Additionally, the USFS

planned additional traffic calming measures that would limit speeds as to limit the kicking up of dust and consider potential dust mitigation through the treatment of the road with a binding agent. A.R. 2-3 and 90.

Again, such inclusion of objective evidence in the agency decision provides the court with considerable evidence that the Forest Service took the required hard look at this evidence, It is not the court's province to analyze the level of dust brought about by the project. Instead, the court must determine whether the USFS took a "hard look" at the available evidence. The scientific findings using the atmospheric modeling system were analyzed and incorporated into the eventual decision. The court is satisfied that there was a "hard look" at the evidence regarding dust.

As to other environmental impacts, the USFS conducted tests and analysis regarding soil and water quality, biological resources, endangered or threatened species, special habitats, wildlife, plants, and similar resources. Such additional evidence further support the agency's arguments that it gathered fact-specific evidence and relied upon the evidence in reaching its decision and related conclusions.

The plaintiffs also challenge the sufficiency of the agency's analysis of the potential impact of the project upon local property values. Plaintiffs argue that property values are an environmental effect. Plaintiffs argue that the regulatory definition of "effects" includes both environmental and economic consequences. See 40 C.F.R. § 1508.8. Plaintiffs cite to 42 U.S.C. § 4332(2)(c) to support their argument that the agency should have further analyzed economic consequences of the proposal. The NEPA refers to environmental impacts, not economic consequences, of agency decisions. See Western Radio Serv. Co., Inc. v. Espy, 79 F.3d 896, 902-03 (9th Cir. 1996)("NEPA's purpose is to protect the environment, not the economic interest of those adversely affected by agency decisions."). The plaintiffs suggest that the proper standard is "any

environmental impacts" that "might result from the proposed agency action." Pl. Resp. Brief 16 (ECF #21). Property values are not "arguably within the zone of interests to be protected" by the NEPA. See Clinton Comm. Hosp. Assoc. v. Southern Maryland Hosp. Assoc., 510 F.2d 1037, 1038 (4th Cir. 1975). Property values are not an environmental impact, but instead an economic consequence. The only use of "effects" in the cited statute is found in 42 U.S.C. § 4332(2)(c)(ii), which provides that federal officials must detail "any adverse environmental effects which cannot be avoided should the proposal be implemented." Id. The statute's sentence *does not* read "any adverse effects," but instead "any environmental effects." The particular modifier *environmental* limits the word "effects" to only environmental effects, not the word's full definition in 40 C.F.R. § 1508.8. Accordingly, the plaintiffs' argument fails as a matter of law and the argument that the agency did not adequately review this issue is without merit.

The plaintiffs raise additional arguments regarding road maintenance costs, controversy, and mitigation measures. Pl. Resp. Brief. 17-20 (ECF #21). First, the plaintiffs' argument regarding road costs are largely, if not entirely, aligned with the property value argument discussed above. See Pl. Resp. Br. 19 (ECF #21). To the extent that these arguments are aligned, the court follows its analysis above. Second, the record demonstrates that road costs were part of the decision-making process. A.R. 193 ("This responsibility has been factored into the decision making process to ensure that road maintenance is conducted to standard.").

Next, plaintiffs argue that the defendant agency's claim of "no scientific controversy" is in error. See Pl. Resp. Brief 19-20 (ECF #21). The plaintiffs allege that this claim led to the decision to issue an EA and FONSI rather than an Environmental Impact Statement and represented the agency's error. See Pl. Resp. Brief 20 (ECF #21). One part of the FONSI—the "S" portion of the acronym—requires a determination of whether an impact is "significant." The

agency determined that there was no *significant* impact and issued ten specific findings. As discussed above, the decision whether to issue an EA and a FONSI or an Environmental Impact Statement is within the scope of the agency's decision-making. Moreover, the court will refrain from such "fly-specking" after-the-fact. See Nat'l Audubon Soc'y, 422 F.3d at 186.

"Controversy" refers to a substantial dispute involving the project, not simply due to public opposition to the project. Global Sustainability Incorporated's Forest Protection v. McConnell, 829 F. Supp. 147, 153-54 (W.D.N.C. 1993). Here, the agency determined that there was no scientifically-verifiable controversy over the impact of the project. A.R. 5 ("[t]he effects on the quality of the human environment are not likely to be highly controversial because there is no known scientific controversy over the impacts of the project."). As noted above, the court defers to the agency's expertise on these specific, scientific matters as the agency—not the court—is better positioned to make such a determination.

Finally, the plaintiffs provide a one-sentence argument that defendant may not "rely on perfunctory listings of and vague references to mitigation measures to keep the Range's impacts below the threshold of significance for the purposes of NEPA." Pl. Resp. Brief 20 (ECF #21). The court does not find this argument persuasive. The USFS decision and EA found no significant impacts in the absence of any mitigation measures. The agency prudently included discussion of mitigation measures so that the non-significant environmental impacts of noise, traffic, and dust from could be further reduced. The agency did not take a shot in the dark in coming up with its proposed plan. The agency assessed available evidence, determined that a need existed within the community, and took a "hard look" at the extant evidence. Accordingly, all of plaintiffs' arguments that the defendant agency violated the NEPA fail as a matter of law.

### b. State Law Claim

The plaintiffs allege that the agency's decision in September 2013 was in "manifest violation of North Carolina state law." Pl. Complaint 19 (ECF #1). Under plaintiffs' logic, the September 2013 decision "sought to form a contract that was patently invalid" under state law and as such was a violation of the APA. As plaintiffs' note, "the only legal issue here is whether Defendant approved a contract" with the Clay County Sports Club that at the time of the September 2013 decision violated state law. Pl. Resp. Brief. 21 (ECF #21). The plaintiffs wish to characterize the agency's decision as entering a contract, noting:

> [T]he ultimate goal of the [shooting] Range project, whereby Defendant agrees to provide space for the Range in exchange for the [Clay County Sports Club] agreeing to build, operate and maintain the Range to Defendant's specifications, on Defendant's land, in perpetuity, also clearly entails a contractual arrangement between the two sides."

Pl. Resp. Brief 23 (ECF #21). The agency's decision was not a contract. The 2013 decision did not create a contract with the Clay County Sports Club or any other entity. As plaintiffs' themselves concede, the Club is not mentioned at all in the September 2013 decision. Pl. Resp. Brief 22 (ECF #21). While plaintiffs contend that the defendant's "continuing intention to contract" with the Club was clear from a general passage in the decision notice, a n "intention to contract" is simply not a contract. The court's task is to review the agency's determination agency action and determine whether the action was arbitrary, capricious, an abuse of discretion, a violation of lawful procedure, or otherwise not in accordance with law. The plaintiff has the burden of proof; inasmuch as plaintiff has failed to show the existence of any contract, its claim that the agency action violated North Carolina contract law is untenable.

## IV. Conclusion

The court's review is, at its most, deferential. The agency's task involved the weighing of community interests, gathering evidence, considering that evidence, and applying the agency's specific expertise in coming to a conclusion. The court's task is to determine whether the agency properly followed the NEPA and the APA. The court finds that it did so, as it took a "hard look" at the potential environmental impact of the proposed project and considered relevant evidence. After careful review, the court rejects each of the plaintiffs' allegations and rules in favor of the defendant.

## ORDER

**IT IS, THEREFORE, DECIDED AND ORDERED** that plaintiffs' Motion for Summary Judgment (#14) is **DENIED** and the defendant's Motion for Summary Judgment (#18) is **GRANTED,** the final decision of the Forest Service is **AFFIRMED**, and this action is **DISMISSED**.

The Clerk of Court is instructed to enter a Judgment consistent with this Memorandum of Decision and Order.

Signed: October 13, 2016



Max O. Cogburn Jr
United States District Judge